H7BsPARs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                 v.                          16 CR 473 (RA)

HAENA PARK,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        July 11, 2017
                                        12:20 p.m.


Before:

                     HON. RONNIE ABRAMS,

                                        District Judge


                          APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
CHRISTINE MAGDO
     Assistant United States Attorney

FEDERAL DEFENDER OF NEW YORK
     Attorneys for Defendant
BY:  JULIA L. GATTO

ALSO PRESENT:
PAUL ROONEY, HSI Special Agent

H7BsPARs

1          (Case called)

2          MS. MAGDO:  Good afternoon, your Honor.

3   Assistant United States Attorney Christine Magdo on behalf of

4   the government.

5          With me at counsel table is HSI Special Agent Paul

6   Rooney.

7          THE COURT:  Good morning.

8          MS. GATTO:  Good morning, your Honor.  Federal

9   Defenders of New York by Julia Gatto for Ms. Park.

10          THE COURT:  This matter is on for sentencing,

11   United States against Park.  Ms. Park pled guilty in January to

12   commodities fraud.  In connection with today's proceeding, I

13   reviewed the following submissions:  The presentence

14   investigation report dated June 20, including the

15   recommendation and addendum; Ms. Park's sentencing memorandum

16   dated June 27 with the accompanying exhibits, as well as the

17   reply letter dated July 10; the government's sentencing

18   memorandum dated July 5, also with accompanying exhibits and a

19   reply letter dated July 10; and I also have read all of the

20   victim impact statements submitted.  There are 11 or 12.

21          With the one today, Ms. Magdo, is that the twelfth

22   one?

23          In any event, I have read all of them, which I

24   understand represent 18 victims and their dependents.  I have

25   also read the victim's statements attached, of course, to

H7BsPARs

1    Ms. Park's sentencing memorandum, and I recognize that those

2    are victims as well.

3         MS. GATTO:  Just a note for the record, there was

4    one victim letter that was duplicated in the e-mail that was

5    sent.  That letter appears twice.

6         THE COURT:  Right.  I have received two copies of a

7    few things because I received part of them in the government's

8    submission dated yesterday and I had read all of those already.

9    But in any event, I have read them all.

10        I'll note later in the proceeding, but I'm happy to

11   hear from any victim who would like to be heard today.  Just to

12   be clear, have the parties received each of these submissions

13   and has everything been filed on ECF even if it is in redacted

14   form?

15        MS. MAGDO:  From the government, yes.

16        MS. GATTO:  From the defense, yes.

17        THE COURT:  Let's begin by discussing the presentence

18   report, which is a report prepared by the United States

19   Probation Office.

20        Ms. Gatto, have you reviewed the presentence report

21   and discussed it with your client?

22        MS. GATTO:  I have, your Honor.

23        THE COURT:  Do you have any objection to it?

24        MS. GATTO:  No, your Honor.  No factual objections.

25        THE COURT:  Ms. Park, have you read the presentence

H7BsPARs

1    report and had an opportunity to discuss it with your attorney?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  Ms. Magdo, does the government have any

4    objections to the presentence report?

5            MS. MAGDO:  No, your Honor.

6            THE COURT:  All right.  The court adopts the factual

7    findings in the report.  The presentence report will be made a

8    part of the record in this matter and placed under seal.  If an

9    appeal is taken, counsel on appeal may have access to the

10   sealed report without further application to the court.

11           Ms. Park, you remember, I'm sure, when you pled guilty

12   in January, we discussed the Federal Sentencing Guidelines.  As

13   you know, they are a set of rules published by the United

14   States Sentencing Commission in order to guide judges when they

15   impose sentence.  Although at one time they were mandatory,

16   meaning judges were required to follow them, they are no longer

17   binding.  Nonetheless, judges must consider them in determining

18   an appropriate sentence, and thus, must ensure that they have

19   properly computed the guidelines range.

20           Am I correct that the parties agree, consistent with

21   the plea agreement, with the guidelines calculation in the

22   presentence report pursuant to which Ms. Park is facing a

23   guidelines range of 108 to 120 months?

24           MS. MAGDO:  Yes, your Honor.

25           MS. GATTO:  Yes, your Honor.

5

1          THE COURT:  Based on the parties' agreement and my

2     independent evaluation of the sentencing guidelines, I accept

3     the guidelines calculation in the presentence report.  I find

4     that Ms. Park's offense level is 31, her criminal history

5     category is I, and her recommended guideline sentence is 108 to

6     120.

7          As I said a moment ago, that range is only advisory.

8     Courts may impose a sentence outside of that range based on one

9     of two concepts, a departure or a variance.  A departure allows

10    for a sentence outside of the advisory range based on some

11    provision in the guidelines themselves.  In the plea agreement,

12    both parties agree that no departure from the guidelines range

13    was warranted.  Nonetheless, I have considered whether there is

14    an appropriate basis for departure from the advisory range

15    within the guideline system.  While recognizing I have the

16    authority to depart, I don't find any grounds warranting a

17    departure under the guidelines.  I do, though, also, of course,

18    have the power to impose a non-guideline sentence based on what

19    we call a variance, which I understand the defendant is

20    seeking.

21          With that, I'll hear first from the government or any

22    victims that would like to be heard.

23          MS. MAGDO:  May I inquire as to whether there are any

24    victims, your Honor?

25          THE COURT:  Yes, of course.

1              Would you like to be heard today?

2              MR. GRANT:  Yes, please.

3              THE COURT:  Please come up to the podium and state

4    your name for the record, and I'm happy to hear anything you

5    would like to say today, sir.

6              MR. GRANT:  Your Honor, thank you for allowing me time

7    to speak.  My name is Ryan Grant.  You have before you, among

8    all those letters, not one but two from me; one in my capacity

9    as a victim and one from my perspective as somebody who has

10   watched Haena over the past year come to terms with her crime.

11   So I will not repeat what I have written there.

12             I understand, although I obviously have not yet heard

13   them today, that the U.S. Attorney is asking for a strict

14   sentencing because of the severe impact that Haena's fraud has

15   had on the victims.  I fully recognize that some victims are

16   very upset and want to lock her up and throw away the key.

17             I can appreciate that desire for I, too, am upset.  My

18   wife and I lost $400,000 that represented most of what we had

19   saved for my three boys' education and for our own retirement.

20   And, even worse, I was personally betrayed by somebody I

21   consider a sister.  But I came here as a victim to say that,

22   although the U.S. Attorney's office may speak for some victims

23   with regard to sentencing, they do not speak for me.  In fact,

24   they did not ask me.  And I know they do not speak for at least

25   12 other people who signed the same letter as I did to say

1    that, as victims, as people who were deeply affected by Haena's

2    crime, it will only increase our pain if she is sent to prison.

3              That is not because we want her to get off easy.

4    Still less, because we are all closely related, some who signed

5    that letter are friends of friends, though I am her

6    brother-in-law.  Rather, it is because we want Haena to face

7    what she has done and walk the difficult and narrow road to

8    redeem her life and build her integrity for much longer than

9    108 to 120 months.  And we do not see that prison serves that

10   purpose in her particular circumstances.  We would rather see

11   this court supervise a robust combination of counseling,

12   significant community service time, and financial restitution

13   to the extent possible.

14             As this hearing has approached, I have been asking

15   myself if this request for mercy and alternative sentencing is

16   in truth what the U.S. Attorney would claim it is, letting

17   Haena off the hook, letting her get away with her crime.  Yet,

18   I can't quite place my finger on what she would be away with.

19   She never benefited financially from this crime, never

20   appropriated the money for her own use, never lived any

21   differently than she has for the 20 years she's lived in

22   New York.

23             What she did was hide her losses and increase her

24   stakes out of fear and pride, out of a misguided and desperate

25   attempt to save her reputation and the appearance of success.

H7BsPARs

1    I am not excusing that by any means.  Far from it.  But what

2    she hoped to get away with, her reputation, has already been

3    completely and irreparably smashed.

4          She now faces the long road to rebuild her character,

5    her relationships, and I wrote in my personal letter some of

6    the first steps that I have seen her take down that road.  But

7    she will never again regain her reputation, never outlive the

8    public shame that her deeds have brought down upon her.

9          So I entreat you in your sentencing to consider that

10   form of judgment that already hangs over Haena, that loss of

11   what she valued and tried to preserve, and thus, to lend more

12   weight to the nobler aspirations of our justice system, to

13   encourage the penitent to responsibility and restitution.

14         Those nobler aspirations depend upon the belief that

15   all criminals are, in fact, still human, people who need to go

16   on living and choosing to do right, whatever they have done in

17   the past.  My understanding of the U.S. Attorney's position is

18   that the wishes of these 13 victims who are asking you for

19   clemency are invalid because we are too close to Haena.

20   Because everyone is, at least, a friend of a relative of an

21   in-law, although I believe that applies to almost all the

22   victims.  Because we are somehow blind to our own losses

23   because of this connection.  If you'll forgive me, even in the

24   these serious proceedings, as a husband of a divorce lawyer, I

25   am amused by the apparent belief that all families stick

H7BsPARs

1   together when large amounts of money are involved.

2          I propose, instead, that the problem is the opposite;

3   not that we are too close, but the prosecution is too far.

4   They have taken Haena's terrible mistake and, from a distance,

5   without true knowledge, have built a monster out of her, by

6   imputing to her motives she did not have, making assumptions

7   about her lifestyle not backed up by facts, and presuming that

8   nothing but a cage can contain her unrepentant malice.

9          If that were true, then we could only lament our

10  inability to lock away this monster for life, for longer than

11  ten years.  But if Haena is still a person, a person who has

12  started doing what is in her power to reckon with and redress

13  her crime, then I plead with you to assist her in that effort

14  with more effective methods than a cage.  Please see her as a

15  person.

16         Thank you for listening.

17         THE COURT:  Thank you very much.

18         Would any other victims like to speak today?

19         Yes, sir.  You can come forward and please state your

20  name.

21         MR. HAM:  Your Honor, my name is Jacob Ham.  My

22  parents and I were victims of the crime.  My parents lost their

23  retirement and the money that was left for my inheritance.  Not

24  much, maybe two, 300,000.  I can't recall.  I am also her

25  husband, and I became her husband --

H7BsPARs

1          THE COURT:  Take your time.

2          MR. HAM:  I proposed to her after I learned of the

3     crime.  I have known her for 14 years, and I have lived with

4     her for 10 years, and I have not been away from her for more

5     than a week at a time.  So I, of all people, know her the best.

6     And what I know is that Haena's mistake is so profoundly human.

7     It is not an act of criminal mastermind, whose intentions were

8     from the start to manipulate or deceive people for the sake of

9     her own self gain.  It was the act of someone trying

10    desperately to try to care for those she loved with the ability

11    that led her to incredible accomplishments.

12          I thought so long and hard, I thought so much about

13    what it was like for her to set off on this path, and I can

14    only imagine that what I would have done if I had lost my own

15    sister's money and the money that she would have needed to

16    raise her own family, and if all I had to do was to just do the

17    thing that I had been doing for the past seven years with

18    enormous success, and then to -- and that was just to trade

19    money, and she had been doing -- she had been trading hundreds

20    of millions of dollars on a daily basis for a fund that started

21    with millions and turned into a multi-billion dollar fund, then

22    I can only imagine that many of us would make the same decision

23    to just do the thing that we are trained at and excelled at for

24    so long.

25          I completely reject the idea that Haena has

H7BsPARs

intentionally used her Harvard degree and resume to lure
people.  I think those are empty trappings of success.  They
represent something extremely real about her, which is that she
has never known failure and overcome every obstacle in her
path.  Her crime was not of deception, it was an unwaivering
belief in her ability to make things right.

How could someone not have such confidence if they
were able to do what Haena has done, come to the U.S. at the
age of 13 without speaking any English, learning English while
she is going to high school, and then graduate valedictorian of
her school, go to Harvard, get picked up by Goldman Sachs with
just a psychology degree.  That is what I have, by the way, so
I know it is not that much of a big deal.  Get plucked by her
boss and friend who is here, who launched the hedge fund
together.  It's an incredible story.

I saw this belief and determination every day in
action since I've known her.  I have never seen anyone who is
more capable of driving herself to focus and work.  And it was
this drive that inspired me to accomplish what I have done in
my life and apply for a federal grant to serve traumatized
children.

When she traded and worked the way she did for so
long, she never had a full night's rest.  She had to wake up at
the start of every market from Hong Kong, London to the U.S.,
and she even slept with an iPad propped up in front of her

H7BsPARs

1    face, just a few inches from her face because she can't see

2    very far.  She had all these tiny little alarms that I couldn't

3    make sense on, and it would beep throughout the night to wake

4    her up.  She was so focused, she wouldn't eat or move from her

5    desk.  And I would come home and beg her to, like, take a

6    break.

7          And with all her medical conditions, it was just the

8    worst thing she could have done for herself.  The cost to her

9    body was so tremendous.  There are so many days when she would

10   just collapse with fatigue or illness and lie in bed for days

11   on end or be exposed to random cleaning products or just the

12   heat from the son or dirt from the street or just, like, the

13   wrong food or just, like, too much stress and she would just

14   blow up like a balloon.  Her immune system was so weak and she

15   was so reactive to nearly everything.  She breaks out in hives

16   and swells so badly, her eyes would nearly shut, and her lips

17   would get so swollen that her lips would just tear from how big

18   they were getting.

19         There were all these scary times, whenever the

20   swelling would travel down her face into her throat and lungs,

21   and I would have to run to the bathroom to get the EpiPen.  And

22   she would just grab it and stab it into her thighs, and we

23   would have to wait for 30 minutes.  And she would sit there

24   just wheezing, waiting for the EpiPen to kick in, and I would

25   be so afraid.

H7BsPARs

1          It's been much better for the past couple years

2     because she has found this new medicine called Xolair that she

3     has to go to a doctor and have a monthly injection and they

4     have to sit and watch to make sure that she doesn't go into

5     anaphylaxis just because of the injection itself.  And since

6     that time, she hasn't had to use an EpiPen, but it doesn't last

7     very long.  And even within, like, three weeks before the next

8     monthly injection happens, she starts to get hives again and

9     get red and splotchy.  We have to be careful about what she is

10    exposed to.

11         Even with the Xolair, her immune system is still

12    compromised and she will catch every cold, every infection

13    there is.  So anytime she flies, she gets a cold.  If I come

14    home with just a scratchy throat, then she'll have the worst

15    cold ever and she will be laid out in bed for a week.

16         I can't imagine what it is going to be like for her if

17    she has to go to prison with her immune system compromised the

18    way it is.  We live in such a controlled environment now with

19    an Army of specialists caring for her and in prison, she'll

20    have reactions to everything and catch every infection.  I have

21    nightmares about her dying in prison going into anaphylaxis.

22         I am the only one who really can appreciate Haena's

23    intentions and know how truly vulnerable her body is.  I'm the

24    only one who has seen it.  I have seen her work for 14 hours

25    straight, and I'm the only one there to help nurse her when

H7BsPARs

1    she's sick.

2           Everyone else just sees her when she is healthy.  The

3    only thing they've ever seen of the illness is when she is not

4    there.  She doesn't show up for things.  Ask anyone how many

5    times she flakes out on appointments.  It is not because she

6    doesn't want to go, it is because she is just too sick to come.

7           I can also testify to the fact that she did not lead a

8    lavish lifestyle.  Yes, her personal spending was much greater

9    than I can afford on my salary of a psychologist, but her

10   spending was never extreme.  And it was modest in comparison to

11   the other people that she knew in finance.  They had six-figure

12   watches on their wrists, they had luxury cars, talked about

13   buying summer homes Upstate.

14          And we haven't even vacationed in the past few years.

15   She hasn't vacationed for seven years since leaving the

16   Fortress.  We only started to travel because I personally

17   begged her to.  She only took two days off a year, and I felt

18   like we needed a break.  And we had met these friends who love

19   to travel, and they would invite us.  It became the right

20   opportunity for us to to finally take time off.  Even when we

21   traveled, she took a laptop and two extra monitors with her,

22   and she would stay at least three to five hours in the hotel

23   room trading.  She never took a break.

24          I also want to testify to the fact that every

25   friendship that she built over the years have been sincere, and

H7BsPARs

1   I know that because these people were my friends too, and we

2   used to talk about them a lot and talk fondly of them.  And

3   today, I see the pain and the loss in her face when we can't

4   talk about them anymore, because we think about the loss that

5   we've experienced.

6          Your Honor, Haena is not a monster.  She is all too

7   human like the rest of us.  She loves her friends and family.

8   She tried their best to get them, even if that meant covering

9   up mistakes while trying desperately to make things right.  I

10  would have never been able to forgive her or marry her or share

11  the responsibility of raising a child together if I had any

12  doubt that she would be not be a loving mother and an amazing

13  influence on our unborn son.

14         In fact, I hope our son is more like her than me.  It

15  would be an utter travesty if her character and humility were

16  done, denied or destroyed by the prosecution and by those who

17  are blinded by range and retribution.

18         I want to remind you that the majority of victims who

19  have contacted the court have not asked for retribution, but

20  rather restitution and restoration.

21         I beg you for mercy today because I truly fear for

22  Haena's life if she goes to prison.  More than anything, I beg

23  you for your objectivity and clarity.  I hope you see through

24  the false characterization and see the remarkable person Haena

25  is to both us, the victims, but also to her.

H7BsPARs

1          Thank you for your time.

2          THE COURT:  Thank you.

3          Would any other victims like to be heard today?

4          Would the government like to be heard?

5          MS. MAGDO:  Yes, please.

6          Your Honor, the defendant's husband and brother-in-law

7    are certainly entitled to express their views and any

8    suggestion to the contrary is not true.  As is the suggestion

9    by Mr. Ryan that the government did not ask me for my opinion,

10   as the court is well aware, our victim witness coordinator

11   sends letters to all victims asking for their input, including

12   Mr. Grant.  So I would like to speak to the court on behalf of

13   the other victims.  The other victims who are not speaking

14   today, but who have written letters, who are too devastated,

15   too humiliated, and too distraught to stand up here and address

16   the court today.

17          For more than six years, the defendant engaged in a

18   massive scheme to defraud more than 40 people of more than

19   $23 million by falsely holding herself out as a successful Wall

20   Street trader and investment advisor.  In truth, she was

21   nothing more than a con artist and her purported investments

22   were nothing more than frauds.

23          Like many similarly situated defendants, Park may not

24   have set out with the intention to steal from her victims, but

25   like all those other criminals whose good intentions turn bad,

H7BsPARs

1    she made daily decisions to continue to lie, to deceive, and to

2    steal.  The harm she caused was not some abstract harm to the

3    market or to anonymous individuals she had never met.

4         On the contrary, Park knew her victims very well.

5    They were her friends, the families of her friends, her

6    colleagues, her own relatives.  Park carried out this scheme

7    for more than six years knowing full well that the money her

8    victims entrusted to her represented their entire life savings

9    or close to it.

10        Park's victims included an elderly individual whose

11   retirement savings she wiped out, immigrants who had spent

12   decades working multiple jobs to achieve the American dream,

13   and parents who have scrimped and saved for their children's

14   education.  And then there is the wheelchair-bound triple

15   amputee from whom she stole $4 million, money that he had

16   received as a result of the terrible accident that rendered him

17   so severely disabled.  As he put it, "She was on a mission to

18   wipe me clean of every dollar."  As another victim wrote, "This

19   was not extra money."

20        I would like to address a couple points made in the

21   defense submissions and that are raised again in the victim

22   statements.  There is a suggestion that there was no

23   self-enrichment on the part of the defendant in committing

24   these crimes.  The defendant writes, "The defense objects to

25   the government's assertion that she used her victim's money to

H7BsPARs

1    enrich herself and maintain her lifestyle."  But I have handed

2    up to the court and also to defense counsel something that was

3    produced a long time ago in discovery, which is a memorandum of

4    the defendant's post-arrest statement.  I would like to point

5    out to the court what she herself says on this topic after her

6    arrest.

7              If you would turn to page seven, in the first full

8    paragraph.

9              THE COURT:  I'm just going to take this as Court

10   Exhibit 1.

11             MS. MAGDO:  Please.  Thank you.

12             Park estimates that she paid approximately 250,000 to

13   $300,000 per year in bills to include legal bills, office

14   space, and other bills.  Park did not have a formal process for

15   personal withdrawals for herself, but estimates that she pays

16   herself a salary of approximately $300,000 for living expenses.

17   Park takes approximately $25,000 per month for living expenses.

18   Park pays the bills and her living expenses from the investor

19   funds.

20             And to corroborate that, we can turn to Government

21   Exhibit 1, which was submitted under seal with the government's

22   initial sentencing submission.  This is a schedule of her two

23   bank accounts that she maintained through the period of the

24   fraud.  We can see on the very first page, the first line, that

25   the opening balance in her bank account on December 5, 2009,

H7BsPARs

1    was $16,000.  This is after she was separated from her last

2    legitimate employment.

3            Further, on page four of Court Exhibit 1, in the

4    middle of the second full paragraph, Park herself admits that,

5    "all large wires into Park's personal and business bank

6    accounts represented investor funds."

7            What did she do with those investor funds?  There is

8    no dispute that she paid her rent, bought her parents a house

9    and a Lexus, and spent money on herself.  This is not

10   uncorroborated.  This is supported by both the bank account

11   records and the statements of numerous victims, who say that

12   she stayed in fancy hotels, traveled first class, went on

13   shopping sprees, and was a frequent visitor to a high-end spa

14   where each night costs close to $2,000.  This is corroborated

15   by the more than $400,000 in credit card payments that are made

16   from these two bank accounts, which are scheduled out and which

17   consists of investor funds.  That $400,000 in credit card

18   payments is separate from the rent, the mortgage, and the car

19   payments that she was also making.

20           One of the victims said that her spending habits were

21   "modest compared to other people in finance."  Well, from the

22   period of 2009 to 2016, the defendant was not working in

23   finance.  She was defrauding people.  So that is not an apt

24   comparison.

25           I would also like to say something in response to

H7BsPARs

1    defendant's attempts to favorably compare this case to the case

2    of Andrew Caspersen.  While the actual loss in that case was

3    greater, approximately $36 million, I think it bears pointing

4    out that $25 million of that actual loss was born by a

5    multi-billion dollar hedge fund, and the additional $50 million

6    in attempted loss was also going to come from a multi-billion

7    dollar hedge fund.  In that case, the actual loss to

8    individuals was approximately half of the loss that Ms. Park

9    inflicted on her victims.

10          In that case as well, Mr. Caspersen had two very young

11   children.  His scheme lasted for a fraction of the time that

12   Park's did.  Park also has aggravating factors, such as when

13   the NFA came to do an audit of her in the spring of 2016, she

14   repeatedly lied to them.  She denied, for example, that she

15   managed any third-party money or distributed any promotional

16   material.  The very purpose of the NFA is to protect investors

17   from this type of fraud.

18          Perhaps most significantly, not a single one of the

19   Caspersen victims suffered a significant financial hardship.

20   In contrast, in this case, the court has received letters from

21   at least 18 victims in which they describe their not only

22   significant, but extraordinary finance hardship suffered as a

23   result of Park's crimes, including the loss of life savings,

24   the loss of retirement accounts that will force them to

25   postpone retirement, and the loss of $4 million that was

H7BsPARs

1    intended to pay for the medical and living expenses of a

2    severely disabled individual.

3             In no event, the government submits, should Park be

4    sentenced to less than four years' imprisonment to which

5    Caspersen, that Caspersen is currently serving and, in fact, is

6    significantly longer sentence is warranted here.  That, your

7    Honor, is because Ms. Park's victims will never be made whole.

8    They will not be made whole financially and they will not be

9    made whole psychologically.

10            In this case, every dollar that Park stole was money

11   that her victims had worked for and saved.  It wasn't just

12   money that she stole.  She stole decades of hard work, of

13   diligent savings, of sacrifice.  She took away their American

14   dream.  To quote from a couple letters, she robbed them of "the

15   previous decade that we worked and sacrificed to save money and

16   the next decade at least that we will need to recover."

17            "A good portion of the results of my life's work in

18   pursuing the American dream."

19            "Countless 60- and 70-hour work weeks."

20            "A big portion of the stability that I worked

21   incredibly hard to build over 53 years of my working life."

22            She has destroyed the "financial security for the next

23   generation."

24            "The sum total of my savings that I had pain-stakingly

25   collected, as well as over $100,000 that I borrowed against my

H7BsPARs

1    retirement."

2            "The majority of the earnings that I have saved up for

3    over 20 years."

4            "My entire cash savings, including all the money I

5    was saving in retirement.  I had diligently saved for nearly

6    20 years."

7            "My life savings, which amounted to just over

8    $3 million."

9            The psychological harm that the defendant caused to

10   her victims is similarly overwhelming.  As has already been

11   discussed, the individuals Park targeted including her close

12   friends, former classmates, and her relatives.  Often those

13   victims would refer others with whom they had a trusted

14   relationship to Park.

15           As one victim, who had been a close friend with Park,

16   put it, "With her Harvard education and intentionally

17   show-casing of great wealth, she intentionally preyed on

18   victims and that connections to others in a shocking

19   incomprehensible masterful destruction of people's entire life

20   savings; people who included older retired couples, couples

21   with children under the age of six and a paraplegic."

22           Another couple wrote, "Park took the money after

23   meeting our children, holding them, and telling us how lovely

24   they are."

25           A couple with two children that had known Park for

H7BsPARs

years and from whom Park stole $2.2 million wrote, "Park is not

a simple thief.  She is a serial liar who preyed on friends,

family, associates and strangers.  Her crime has "changed the

way we think about people and our trust in people, not to

mention the division it has created within our family due to

taking responsibility for this horrific situation.  I am unable

to look at things the same way ever again."

          "She preyed on the closest of relationships and those

that could least afford to lose their life savings."

          Park could have admitted her failures early on and

lessened the loss to the first victims, but she chose not to do

so, and preyed on innocence until the very end.

          Another victim writes, "For me, the financial loss,

while significant and tremendously impactful, has paled in

comparison to the deep traumatic grieve and loss I have

experienced as a result of being lied to and betrayed for

years."

          A victim who has known Park for nearly 20 years and

who considered Park a member of our family.  A woman who

"unvetted all of her liquid cash savings and even liquidated

her 401K," and who was told by Park, that was more like a

sister to her than a friend wrote, "not only did I lose all of

my savings, but I accepted a lesser-paying position following

Park's advice.  She advised me to accept the position because I

no longer needed to save for retirement.  She assured me that

1  my money would continue to grow in her fund, and that even with

2  the salary cut, I could probably retire by age 50.  Instead of

3  knowing that my retirement is secure, I have to begin saving

4  all over again with greatly reduced flexible income.  My family

5  and I are emotionally and financially devastated by the

6  betrayal of someone that we considered to be a beloved member

7  of our family.  I am not certain how I will ever recover."

8          Your Honor, against this backdrop of financial and

9  emotional devastation of this serious elaborate, long-running

10 fraud, the defendant presents no credible or persuasive

11 mitigating factors.  There is no claim of economic hardship.

12 There is no claim that the defendant didn't know what she was

13 doing was wrong.  There is no addiction or mental illness.

14 There is no coercion or pressure from a coconspirator.  There

15 is nothing.

16         The only thing the defendant comes up with are her

17 health issues, but these are a distraction.  As your Honor is

18 well aware, the BOP deals every day and cares for severely ill

19 individuals.

20         THE COURT:  Let me just ask about that.  I mean, I

21 read in your letter about who you've spoken to in the BOP, but

22 have you really outlined each of her medical conditions and

23 assured that they can take care of each of them?

24         MS. MAGDO:  Yes, your Honor.  In fact, I should have

25 mentioned this.  I submitted to the BOP the defendant's

H7BsPARs

unredacted submission, which alleges and sets forth each of the

conditions, her medications, the affidavit of Mr. Philip Weiss,

and that is what they were considering when they gave me this

assessment.

     Initially, when the probation officer had spoken with

the BOP, he had only a more general sense of what her ailments

are.  But when I spoke to the BOP, I had given them the

defendant's submission in its entirety, and they have no doubt

that her conditions can be managed while she is incarcerated.

     THE COURT:  The idea is that she would likely be

housed at the Federal Medical Center Carswell in Fort Worth,

Texas.

     MS. MAGDO:  Yes.  While BOP can't make a designation

before the defendant is actually sentenced, that is their

belief, at this point, is that is where she would be

designated.

     THE COURT:  Among other things, they can monitor the

brain aneurysm?

     MS. MAGDO:  Absolutely.

     THE COURT:  Please proceed.

     MS. MAGDO:  Your Honor, in closing, I would just like

to read a couple excerpts from a letter submitted by the man

from whom Park stole the largest sum of money, $4 million.

     Judge Abrams, the letter begins, "The money that Park

stole from me was not money that I had inherited from rich

H7BsPARs

1    parents.  It was money that cost my flesh and bones.  It was

2    money that was supposed to cover my medical expenses and cost

3    of living after a medical mistake in 2003 caused me to lose my

4    two legs, my right hand, my hearing, and the function of my

5    kidneys.  In addition, I lost the use of most of my joints,

6    experience cardiac arrhythmias, have had 24 surgical

7    operations, more than eight years of slow recovery and physical

8    therapy.  I also endure chronic pain and have a lost list of

9    medications, including immunosuppressant medications after my

10   kidney transplant surgery.  Park convinced me that I needed to

11   grow my money so it could last me until old age."

12         The victim describes how Park befriended him, gained

13   his trust over time, and created in him the fear that another

14   economic collapse was coming and that his money was only safe

15   if invested with her.

16         He concludes, "I don't know if I will ever get

17   closure.  The devastation she created is not just financial, it

18   is physical, emotional, spiritual and psychological.  It is

19   indescribable.  It is insurmountable."

20         Thank you, your Honor.

21         THE COURT:  Thank you.

22         Ms. Gatto, would you like to be heard?

23         MS. GATTO:  I would.  Thank you, your Honor.

24         I would like to start out by acknowledging the people

25   who are here to support Ms. Park.  Some of them we have heard

H7BsPARs

1    from in really poignant speeches, but also Mr. Stevens is here

2    in the front in a wheelchair.  He is the individual, the

3    founder of the community service organization that Ms. Park has

4    devoted over 1,000 hours to.  You know from my letter that

5    she's saved that organization from basically extinction, and

6    now they are poised to get millions of dollars in grant

7    funding.

8            Mr.Novogratz is here also.  That is Ms. Park's former

9    employer at Fortress.  He was the managing director there.  He

10   is also her current employer now.  He wrote a very moving

11   letter.  We have heard from some of the victims, and there are

12   other victims here of family.  Ms. Park's parents are here,

13   Ms. Park's sister is here, and a dear friend of Ms. Park is

14   also here.

15           I also want to talk about the victims.  The government

16   spent most of its time talking about the victims, and I too

17   want to do that, because I think there is really no dispute,

18   your Honor, that the victims' voices voiced here by the

19   prosecutor are real.  The loss here, I agree with the

20   prosecutor, is less about finances and more about emotion, what

21   those finances relate to.

22           THE COURT:  It's both.

23           MS. GATTO:  Emotionally, yes.  I think that is right.

24   It is both.

25           The offense is egregious, your Honor.  It is a long

H7BsPARs

```
 1    period of time of lies, deceits, omissions.  It involved a lot
 2    of money.  But really, what I submit is the most tragic -- and
 3    there are lots of tragic dimensions to this case -- but is that
 4    these people were people who Haena did and continue to care
 5    deeply about.  In that tragic dimension, your Honor, I think
 6    there is value to the court, because what you're hearing from
 7    some, not all, but some victims who are so close to Haena is
 8    their journey of forgiveness because they know Haena and
 9    because they can understand the real complexity of the
10    motivations of this crime.  It is something that I just don't
11    think we can dismiss.
12         It is true, Caspersen had a gambling addiction.  I am
13    not saying she has a gambling addiction.  I am not saying there
14    was financial desperation, but the motivation here is
15    complicated.  And it is, as Mr. Ham said, very human.  It is
16    a lifetime of family pressure, cultural pressure, internal
17    pressure that this woman had on her.  I am not suggesting that
18    this is going to bring comfort to the victims who lost their
19    life savings.
20         THE COURT:  Who took out a mortgage for the home for
21    the very point of giving money when she knew full well was all
22    based on a lie, that she was failing, that she knew that there
23    were people's life savings.
24         MS. GATTO:  Absolutely.  I am not suggesting that it
25    makes that pain, whether financial or emotional, less, but what
```

H7BsPARs

1    I am suggesting is, on the spectrum of offenses, the motivation

2    has to be evaluated if we are imposing a sentence about

3    culpability.

4             The tragic thing here is that Haena put this

5    incredible pressure on herself.  Again, I don't find this as an

6    excuse, I think it is an explanation, one that the court has to

7    looking at if we are going to really sentence the person who is

8    before this court.  She put this incredible pressure on

9    herself.  At the same time, she had so much confidence in

10   herself.  I think that that is the crime here.

11            The hubris in thinking, I am not going to lose these

12   people's

13    money, I am not going to lose these people's money, that is

14   how a fundamentally good person can do what Haena did.  That is

15   how she is able to lie to the people she loves.  That is how

16   Haena can allow people to take out mortgages on their homes and

17   do all of these devastating things financially, because Haena

18   has done nothing but overcome obstacles in her entire life

19   since sixteen, and Haena thought she was going to do that.

20   Haena wanted to do that.  Haena's entire life, since she came

21   to this country, has been doing that.

22            Again, your Honor, I am not saying that this excuses

23   the conduct, and I am not saying that there should be no

24   punishment for the conduct, but I think it is a dimension, a

25   tragic dimension, that can't be so easily overlooked.  The

H7BsPARs

1    government lists comparable defendants, and I say that with air

2    quotes, including an individual who committed a Ponzi scheme

3    where he purchased an island on Nova Scotia with the proceeds.

4          I, again, am not suggesting that Haena lived like a

5    monk during this period, but Haena's motivation, Haena's

6    driving force was not financial gain.  It is something that

7    makes this case unlike, by really a million light years, the

8    cases the government is asking this court to rely on.

9          Your Honor, her motivations, her demonstrated remorse,

10   her commitment to community service, her poor health, her

11   pregnancy, her ability and desire to make restitution, all of

12   these things are fundamentally important in making a decision

13   about what is sufficient but not greater than necessary.

14   You're really not hearing the government talk about those

15   things.  We have a sentencing system in place, punishment, a

16   voice to some of the victims.  This is all part of it.  But the

17   court has to ask itself the question, does a jail sentence, a

18   lengthy jail sentence or any jail sentence serve those

19   objectives in the most sufficient, without being greater than

20   necessary?

21         THE COURT:  If you think I give a sentence of home

22   detention, what kind of deterrent message am I sending?

23         MS. GATTO:  Your Honor, specific and general.

24         THE COURT:  Let's talk about general.

25         MS. GATTO:  Your Honor, the deterrence here has

H7BsPARs

1     already, the message to the public has already been sent.

2     There is plenty of studies that show this, especially in

3     white-collar crime.  The arrest, the loss, the collateral

4     consequences send a message.  That is actually --

5              THE COURT:  They send a message to her.  It may affect

6     specific deterrence.  With respect to general, you think that

7     is sufficient?

8              MS. GATTO:  I do, your Honor.  I definitely think it

9     is a very strong message.  Is it sufficient?  I do think so.

10    But plus, your Honor, I'm not asking her to get off scot-free.

11    I spent a lot of time, a lot of time thinking about what the

12    right sentence is.  This is for me, and I wouldn't be surprised

13    for the court too, one of the hardest sentencing

14    recommendations I have had to make.

15             THE COURT:  This is one of the hardest sentencings

16    that I have had to impose.

17             MS. GATTO:  I am not surprised by that.  I think the

18    guidelines don't offer us guidance, your Honor.  I think there

19    might be a temptation that we can't take to say the guidelines

20    are -- I don't mean to be flippant -- the guidelines are crazy.

21    Let's cut it by 50 percent.  Let's cut it by 75 percent.  That

22    accounts for the mitigation and all of that.  That is not

23    really right too.

24             What I did and what I am asking the court to do is

25    methodically go through think 3553, as it is clear that the

H7BsPARs

court is doing.  Your question about general deterrence is

exactly what I would ask the court to do.  Go through each one

of them.

          Your Honor, because of general deterrence and

punishment, I am not asking for probation.  That is where I

spent all of my time.  I am asking for a year and a half of

house arrest, and that is what I thought of as an alternative

to incarceration.  What we are really proposing, what I really

think is the only thing that is true to the statute, all of

that statute, is some alternative to incarceration.  A year and

a half under house arrest, I have never seen a year and a half

of house arrest.  The longest house arrest sentence I have seen

imposed in a very serious case was nine months.  That is why I

doubled it.  I doubled it to a year and a half.

          We are open to all alternatives to incarceration to

make it as punitive, as loud of a message to the public as

possible, while sparing her from incarceration, which is

accomplishing nothing here.

          THE COURT:  This is a crime she committed every day

for six years against 40 people, and she lost over $23 million.

And your proposal is she should stay at home?

          MS. GATTO:  Yes, a prisoner in her own home.  I can

see that, at the front of my submission, it is an extraordinary

request.  I didn't originally arrive at this sentence this way.

I told you it took me months.  I recognize how crazy it is to

H7BsPARs

1   ask for house arrest in the case where the losses are over

2   $20 million.

3          THE COURT:  It is not just the number of the loss, and

4   I'll talk about that later with respect to your argument

5   regarding the fraud guidelines.  This is not a case where there

6   was one loss, there was one fraudulent loan for a high loss

7   amount.  This was every day for six years leading up to that

8   loss amount.

9          MS. GATTO:  Yes.  Your Honor, I thought Mr. Ham really

10  articulated something that I couldn't articulate.  Every day of

11  those six years, on one side there certainly lies -- and I'm

12  not at all suggesting otherwise -- but on the other side is

13  working herself to the bone, desperate to try to get this money

14  back thinking, based on her life's --

15         THE COURT:  Taking more money from new people.

16         MS. GATTO:  Yes, your Honor.

17         THE COURT:  Knowing that she has lost everything so

18  far.

19         MS. GATTO:  Yes, your Honor.

20         THE COURT:  New people, right?  New people with life

21  savings, with hopes of donating to children, grandchildren,

22  medical needs.

23         MS. GATTO:  Yes, your Honor.  It is devastating to

24  them.  It is devastating and it is worthy of punishment, but I

25  go back to what I say.  We have to account somewhat for what is

H7BsPARs

1  going on in her mind.  It is the same reason --

2          THE COURT:  I agree, we do.  That is a relevant

3  factor.  I don't disagree with that.

4          I think why someone commits a crime is relevant, among

5  other things.  It will help determine if they are likely to

6  recidivate in the future.  And if they are doing it for greed

7  or to help a loved one, I think that matters.

8          MS. GATTO:  Again, we are focusing only on -- it is

9  certainly an important focus, the devastation to the victims,

10  the need for retribution for those victims and the need for

11  punishment at the expense of the other factors.  I wonder,

12  really, what putting her in jail for X number of months,

13  whatever it is, the victims may have some emotional closure

14  for that.  The punishment will be sent there.

15          But what we're actually doing is we are going against

16  other factors, including restitution.  If we are going to talk

17  about the victims, we should.

18          THE COURT:  How much money is she making now?  I know

19  she is working.

20          MS. GATTO:  She made $15,000 in three months, your

21  Honor.  Her health, as you know, she had brain surgery in the

22  interim.  There was a period of time where she was getting back

23  on her feet.  In three months, she earned $15,000.  She earns

24  $100 an hour doing research for Mr. Novagratz's media company.

25  That $15,000 is all $15,000.  This isn't a case where I'm

1    saying, your Honor, my client will agree to 10 percent of the

2    salary, 15 percent of her salary.  That is every penny.

3          Her and her husband are living off of his salary.  She

4    is doing everything she can.  Now, $15,000, it's a drop in the

5    bucket when it is $23 million.  But if the government got its

6    way and put her in jail for nine years, if she is lucky enough

7    to be in the UNICOR program, she will earn 23 cents an hour.

8    Those nine years, that is half a million dollars.

9          THE COURT:  That is true for every white-collar

10   defendant, right?  That is like saying no one should go to

11   jail, stay out and make money to pay restitution.

12         MS. GATTO:  That may be true, your Honor, for other

13   defendants that have the ability, but rarely, certainly in my

14   practice, I have never seen someone not only with the ability

15   to make restitution, but the desire, really, the need to make

16   restitution.

17         I mentioned this in my sentencing submission.  From

18   the day I met Ms. Park, all she has talked about is what can I

19   do to put some pool of money together.  So the home that she

20   bought for her parents, which she purchased with the proceeds

21   from her legitimate salary of Fortress where she was earning $1

22   million, she discussed this.  I said, you know, that money,

23   that home was purchased with legitimate proceeds.  You had

24   considerable savings when this started.  There is an argument

25   that the mortgage payments were paid from yours.

H7BsPARs

1      She was very sloppy, your Honor.  Everything is all

2   mixed up.  So whether I would prevail or not, Haena would not

3   hear of it.  Haena said no, that home I am going to sell.  Not

4   only do we agree to forfeit it.  This is really unusual, the

5   government will tell you, she put it on --

6      THE COURT:  It is.

7      MS. GATTO:  She put it on the mark.  She found the

8   buyer.  The first buyer fell through.  She found another buyer.

9   The money went immediately in the car.  The car was purchased

10  for her parents with money from Fortress while at Fortress.  We

11  agreed to forfeit it.  The marshals went to the parents' house

12  and drove the car away.  That is another $15,000 in the fund.

13      So yes, lots of people are smart who commit crimes and

14  lots of people can say I can find a job no problem.  How many

15  times do you have an individual who says, I am going to get a

16  job, right?  She has got a brain aneurysm, she is pregnant, she

17  is suffering from major depressive disorder, and she goes out

18  there and she says, Can somebody give me a job?  And because of

19  who she is, Mr. Novagratz gave her a job.

20      I found his portion -- I highlighted it.  I am not

21  going to read all the letters again.  The court has read them.

22  But I highlighted them in my submission for a reason.  His

23  portion of explaining, I wouldn't -- he's been in finance a

24  long time.  This is a very successful individual.  He has heard

25  of Ponzi schemes before.

H7BsPARs

He implies, I wouldn't just give anyone a job.  I wouldn't give anyone a second chance.  I give it to Mr. Park because I know who she is and I can see what happened here and I can see how important it is to her and to the victims that she make restitution.

I don't think it is fair in any way for the government to suggest that this is buying her way out of prison.  There is a statute, your Honor.  We are required to consider it.  If you had someone who might potentially have a job, that is one thing.  You have someone who has a job, has already put $15,000 in three months.  There is no reason not to believe it will grow.  She is committed to it.  I'll talk about financial restitution and what I've called emotional restitution.

I don't think that the government has ever addressed this, never responded to Ms. Park's community service.  I started out by pointing out Mr. Stevens in the courtroom.  I can't say enough what she did for this organization.  It's important for several reasons.  One, it helps the court with the impossible task here of looking into this woman's soul and saying, What happened here?  Are you really just a fraud and a swindler that I have to put behind bars, or are you a fundamentally good person who lost her way?

Her response to the arrest, your Honor, and not to repeat, it was to sell a home that I said, Hey, let's not sell.  To get a job, even though she is sick, and to devote 1100

H7BsPARs

1    hours, 1100 hours to an organization that she found online,

2    again, I am not going to read the letters because they're

3    powerful enough the first time you read them.

4            But Mr. Stevens is a formerly incarcerated individual.

5    He articulates something I couldn't do, and I feel the same way

6    about Mr. Grant and Mr. Ham.  They are able to say what I am

7    trying to say much more powerfully because they are so close to

8    it.

9            He articulates the ability of this woman, if she

10   remains on the outside, to do those things we strive to do,

11   which is not just punishment.  It is not just punishment.  I

12   will talk about the medical care, your Honor.

13           We don't even have a form letter from the BOP.  The

14   government stands up and says, Well, I spoke to someone and

15   they have no doubt that they can care for her.  I have had

16   cases with medical issues before.  I have never had a case

17   where the BOP didn't even bother to submit the standard letter

18   that she submits that says, Oh, we can do it.  Without that

19   letter, and even if there were that letter, I have a real issue

20   with any confidence that the BOP is going to handle it in the

21   most effective manner.

22           THE COURT:  Do you think it is necessary to adjourn

23   the sentencing and get the letter, or do you take the

24   government's representation that they spoke to the program?

25           MS. GATTO:  I have no reason to believe, and I would

H7BsPARs

1    never suggest the government is lying.  I know the government

2    spoke to the BOP.  They spoke to someone who can't guarantee

3    designations.  That is not what they do.

4         All they have told you about Xolair -- I'll talk about

5    that first, and then all the other conditions -- all they have

6    told you about Xolair is that there is one man somewhere at

7    some point in time with whatever diagnosis, that unknown

8    individual has got Xolair at a facility that she is not going

9    to.  No one can guarantee Xolair to her.  That is the way it

10   works.

11        That is why Mr. Weiss' affidavits, I felt compelled

12   to submit, because through him I learned a lot about how the

13   BOP works, a lot about the formulary, about the delay, about

14   the inability to transport people to places.  He doesn't say,

15   nor would any BOP person say, she is going to or she is not

16   going to.  It is unknown.

17        Is she going to go into anaphylactic shock in prison?

18   Maybe.  We don't know.  Is she going to be able, if she does go

19   into anaphylactic shock, to get the lieutenant to get her

20   EpiPen?  Maybe.  Is she going to get the Xolair shots?  Maybe.

21   There will be a delay, there is no question of that.  Maybe.

22   Maybe.  Will she be triggered by all the allergens that are

23   there?  Probably.  What the results will be, who knows.  Will

24   her aneurysm rupture in prison?  We don't know.  Will she be

25   able to get to the doctors she needs to?  We don't know, your

H7BsPARs

1   Honor.

2          Again, the statute requires us to look at medical care

3   in the most effective manner.  I don't think there can be a

4   dispute, there really cannot be a dispute, that in the most

5   effective manner, those words of the statute are achieved by

6   keeping her on the outside.

7          Again, your Honor, you already said it is so hard.  If

8   we were looking at medical care, there is no question.  I think

9   the sentence I'm asking for complies with the statute, if

10  you're just looking at the need for restitution.

11         But court has to balance it all together, and I'll end

12  where I started, really, in this process.  I try to do that.  I

13  put on the scales of this balancing system, the boulder that is

14  this offense, and then I stack the rocks that are all the

15  mitigation here, your Honor, her medical issues, the fact that

16  she is about to have a baby.  It is really a miracle child at

17  41 years old.  A newborn who is about to enter this world on

18  August 29, and what it will be like for this woman and for the

19  government to suggest that separating a newborn baby from its

20  mother is the same as separating a newborn baby from its

21  father, I think, really flies in common sense.

22         THE COURT:  There are a lot of genuinely

23  heart-breaking things about this case, which is what makes it

24  so hard, right?

25         MS. GATTO:  That's right, your Honor.  That is right.

H7BsPARs

1          THE COURT:  Both for Ms. Park and for the victims.

2          MS. GATTO:  It's a tragic, tragic case, your Honor.

3   All we can ground ourselves in is what is a long or any prison

4   sentence doing here?  How can we make this less tragic?

5          The financial loss can be somewhat diminished by her

6   ability to work, her remorse, her community service, her

7   rehabilitation, her personal journey, her medical care, her

8   relationship with this newborn on the outside, with still very

9   punitive consequences, your Honor.

10          Again, I would have written every alternative to

11   incarceration in my submission if I could think of it.  30,000

12   hours of community service over ten years, she is going to do

13   that either way.  I offered this because I know there is a way

14   to fashion a sentence that deals with that boulder on the other

15   side, but also deals with much bigger than that boulder on this

16   side.  It is punitive house arrest.  If the court considers a

17   longer period, I don't think we would take any position.  We

18   are just trying to balance it all in what is a very tragic

19   case.

20          I am not going to say anything else unless the court

21   has questions.  I have nothing else to say.  I really rely on

22   Mr. Ham and Mr. Grant, who I think articulated what I have been

23   trying to articulate in hundreds of pages of writing in this

24   case and in my advocacy here that prison is too much, not

25   necessary, and there is a way we can do this the right way,

H7BsPARs

1    your Honor.

2              THE COURT:  All right.  Thank you.

3              Ms. Park, is there anything you would like to say

4    today?

5              You can stay seated if you would like, just move the

6    microphone closer, please.

7              MS. GATTO:  Your Honor, can she go to the podium?

8              THE COURT:  Yes.

9              THE DEFENDANT:  Your Honor, I appear before you today

10   ready to accept the consequences of my action, which have

11   devastated the people I care about most in this world.  My

12   downward spiral into this crime began with a dream of forming

13   my own company and bettering the lives, financial lives, of my

14   loved ones and myself.  When I ran into problems and made

15   mistakes, I began to make all the wrong decisions.

16             What started as one lie of omission turned into what I

17   thought would be a temporary misreporting of numbers, and then

18   it eventually snowballed into a monstrous web of lies that I

19   could no longer untangle.  All along I focused on one thought

20   and one thought only, that I could not and would not lose these

21   people's money.  Failure was not an option.

22             I had made promises to the people I loved, and it was

23   my responsibility to fix my own mistakes.  I imagined what the

24   loss would mean for each person and could not let myself walk

25   away.  Worst of all, worst of all, I thought that I had a

fighting chance to make it all back.  By the end, I was lying
to give myself time to consider my risky, incredibly foolish
bets, lying to stall people from withdrawing money, and lying
to solicit more money to fund the withdrawals.

I continued to justify these terrible acts in my own
head by repeating to myself constantly that I'll turn the
losses into gains and pay all these people back once everything
got back on track.  What I should have chosen to do from the
very beginning was to admit my initial mistakes with humility
and honesty.  I should have reached out for help instead of
isolating myself further.

Instead, I committed a terrible, terrible act that is,
at best, a product of unbelievable hubris and cowardice and, at
worst, monstrosity.  What I initially thought was an act to
remedy my mistakes and not cause harm morphed into a betrayal
of the worst kind, that inflicted damages that ended up being
matters worse than my initial mistakes would have been.

My heart crumbles every day thinking about the
devastation and difficulties each of my friends and family is
going through because of what I have done.  I lie awake every
night thinking about the retirement money, the college fund,
the future plans and dreams that are now in jeopardy and
damaged because of what I did to these hard-working people that
trusted my education, my work experience, and above all, my
integrity.

H7BsPARs

1          Over the past year, I apologized over and over again

2     in my head to each person, all the while knowing that no amount

3     of apology would make a difference.  They did not deserve to be

4     hit with this disaster and betrayal.  They deserve their

5     hard-earned money.  They deserved honesty and truth so they

6     could have made informed decisions.

7          For many months, I wanted to end my own life because I

8     didn't know how I could possibly live with the guilt of having

9     caused so much irreparable damage to so many people's lives.

10    But that would have been the ultimate act of cowardice.  The

11    only choice now that I have is to face the consequences and do

12    everything in my power to redress the harm in any way that I

13    can.

14          The painful truth, though, is that there is an

15    emotional scar that many of my victims will not be able to

16    erase for a long time, if ever, no matter how much of their

17    money they get back.  Still, I will live each day doing my best

18    to repair the damage and atone for what I have done.  I will

19    live to teach our unborn child that it is never wrong to admit

20    one's mistakes and failures, and in doing so is the very

21    definition of courage.

22          Lastly, I would like to apologize to the victims who

23    are suffering every day from the financial and emotional injury

24    that I caused.  You are each someone or a friend of someone I

25    loved like family.  I am so ashamed and truly sorry for all the

H7BsPARs

1    lies and pains I caused you.  I imagine you questioning every

2    meaningful moment of friendship and love we shared over the

3    months and years we have known each other, and I can't blame

4    you for thinking that every word and action from me must have

5    been a lie after what you have been through for the past year.

6    There is probably no way for me to help you make sense of my

7    actions, given that you are people I truly loved and cared for.

8    I am so sorry.  I truly wish there were something I could do to

9    undue the harm.

10          There is some of you who have shown incredible mercy

11   and generosity of spirit in forgiving me, even after seeing me

12   in my most broken and ugliest moments.  You have forgiven what

13   I cannot forgive in myself.  It is a debt, it is a debt that I

14   can never repay, but I will work to pay it forward for as long

15   as I live.

16          Your Honor, I know that no amount of remorse or

17   restitution will erase the harm I caused these people, but I

18   will put my best foot forward each day, live the remaining days

19   of my life with integrity, and accept the course of justice

20   prescribed by this court respectfully.

21          Thank you for allowing me this time.

22          THE COURT:  Thank you.

23          I'm going to just take a very short break.  I am going

24   to ask you to stay where you are because I won't be long.

25   Thank you.

H7BsPARs

1          (Recess)

2          THE COURT:  Is there any reason why sentence cannot be

3   imposed at this time?

4          MS. MAGDO:  Not that the government is aware of,

5   your Honor.

6          MS. GATTO:  No.

7          THE COURT:  I'm required to consider the advisory

8   guidelines range of 108 to 120 months, as well as various other

9   factors that are outlined in a provision of the law.  It is

10  Title 18, United States Code, Section 3553(a).  I have done so.

11         Those factors -- and I am supposed to consider all of

12  them -- include but are not limited to the nature and

13  circumstances of the offense, the personal history and

14  characteristics of the defendant, because each defendant must

15  be considered individually as a person and as a human being,

16  Mr. Grant, as you very rightly and pointedly noted.  Judges are

17  also required to consider the need for the sentence imposed to

18  reflect the seriousness of the offense, to promote respect for

19  the law, to provide just punishment for the offense, to afford

20  adequate deterrence to criminal conduct, and to protect the

21  public from future crimes, as well as to avoid unwarranted

22  sentencing disparities among other factors.

23         As I said earlier, this is extraordinarily difficult.

24  As I think we all recognize, on one hand, Ms. Park, you have

25  hurt so many people, good people, people you loved most in the

world.  And, frankly, I read every page of the very stellar

submission your lawyer drafted on your behalf.  I listened to

you here today, and I still don't totally understand how you

could do that, how you could lie and steal from those you love

and those who trusted you day in and day out -- relatives,

close friends, former classmates -- and for so many years.  For

over six years you defrauded more than 40 individuals of

$23 million.  That's staggering, frankly.

One of the things that I think was especially

egregious is that you continued to seek out more money and more

investors through charm and manipulation and personal

relationships, knowing full well that it was all built on a lie

and that you were putting each of these victims' lives in

jeopardy in the process.  I can understand the shame, the fear

of failure, the desperate hope that you would make the money

back, but for those desires to be so much more important to you

than the life savings and the emotional stability and security

of these people, it was selfish, it was arrogant, it was

careless, and callous and cruel.

And while we can calculate the harm in dollars, for

some, that harm is immeasurable.  The loss of livelihood, of

savings, of college funds, the precious fruits of hard labor

from your victims, that they had hoped to pass on to their

children and their grandchildren.  For one victim, you stole

the stability that he had worked for over 50 years to build,

H7BsPARs

1    and the peace that he expected to have at the age of 75 that he

2    no longer has.

3              From another, the government cited his letter, who is

4    wheelchair bound writes that you stole not only $4 million

5    intending to pay for medical care, but left a permanent

6    devastation that is physical, emotional, spiritual and

7    psychological.

8              Many others have described the devastating loss not

9    only of financial security, but the loss of dignity and trust

10   in others, and you caused all of that.  And whether it is out

11   of hubris or confidence or arrogance, you caused it.  And

12   unlike so many people I see sit in that seat you're sitting in,

13   you are not someone without opportunity or without support.  To

14   the contrary, you had a Harvard education.  You have a plethora

15   of people who love you and who support you.  So you have more

16   options in life than just about anyone I've seen sit in that

17   seat.  Yet, you squandered all of those opportunities.

18             So I do think a very substantial sentence needs to be

19   imposed in light of the gravity of these crimes, to provide

20   just punishment, to afford adequate deterrence to others who

21   may be intended to engage in similar conduct.  There will be

22   serious consequences for conduct like this.

23             I have also, though, considered all the arguments that

24   you have made, your intent, that you didn't intend to hurt

25   anybody, you intended to pay all of the money back, you didn't

H7BsPARs

1   commit the crime out of greed, and I believed that you were

2   genuinely remorseful.  I have read all of the letters that were

3   submitted on behalf of your loved ones, who were victims

4   yourself.  I heard Mr. Ham, your husband, and Mr. Grant today,

5   speak so eloquently and heard them plead for leniency on your

6   behalf.  And the generosity of spirit that I have seen among

7   your loved ones is, frankly, inspiring.  And that there are so

8   many people who are willing to do so, to forgive and to plead

9   for leniency on your behalf, says a lot about the devotion that

10  they have to you.

11          And Mr. Grant and Mr. Ham and all of the other victims

12  who have urged leniency, I want to tell you, I have heard your

13  voices.  I have heard the other victims as well, but I have

14  heard your voices too.  And it is all part of this very

15  difficult balance that I am trying to achieve here today.

16          I have considered your argument regarding the fraud

17  guidelines, and I am mindful that the amount of loss is the

18  principal determinate of the adjusted offense level and, hence,

19  the corresponding sentencing range.  I agree with Ms. Park

20  that, in many instances, loss amount on the own is an imprecise

21  and imperfect measure of culpability, but here, as I noted

22  earlier, we don't have a one-time scheme with a loss amount, a

23  large loss amount or something like that, but we have a fraud

24  that was perpetrated day in and day out over years in a

25  meticulous and intentional manner against so many trusting

H7BsPARs

1    victims.

2           I have considered as well your community service and

3    the importance of you getting back to work so that you can pay

4    your restitution.  I have considered the various medical

5    conditions.  With respect to the brain aneurysm, I understand

6    that the embolization appears to have been successful for now,

7    but that you need to continue to be screened and surgery may be

8    necessary in the future.  With respect to your severe asthma

9    and other health conditions, I am persuaded by the government's

10   representation that, based on its investigation and

11   conversations with BOP representatives, that the BOP has

12   medical facilities, including the Federal Medical Center

13   Carswell in Fort Worth, Texas, that can adequately address

14   medical needs, although I will say that I am happy to make any

15   kind of recommendation with respect to medical care.

16          Finally, I have considered that you're due to have a

17   baby shortly and that being separated from him will be a

18   punishment like no other.  So, in sum, while I think that some

19   variance is appropriate in light of your health and your

20   personal issues and some of the other sentencing factors, I

21   have ultimately come to the conclusion that I do think that a

22   significant prison sentence is necessary given the enormity of

23   the crime and the cold and calculating manner in which it was

24   carried out, as well as the financial and emotional harm due to

25   so many.

H7BsPARs

1          I am going to ask you to rise for the imposition of

2     sentence.

3          It is the judgment of this court that you be

4     committed to the custody of the Bureau of Prisons for a term of

5     36 months, to be followed by a term of supervised release of

6     three years.  In my view, this sentence is sufficient but not

7     greater than necessary to comply with the purposes of

8     sentencing set forth in the law.

9          In terms of avoiding unwarranted sentencing

10    disparities, I'll note that I do think that there are very

11    specific mitigating factors present in this case that are not

12    present in others.

13         You can be seated while I describe the conditions of

14    your supervised release, as well as the other details of your

15    sentence.

16         All the standard conditions of supervision shall

17    apply.  The following mandatory conditions shall apply:  You

18    shall not commit another federal, state or local crime, you

19    must not unlawfully possess a controlled substance, you must

20    refrain from any unlawful use of a controlled substance, you

21    must submit to one drug test within 15 days of release from

22    imprisonment and at least two periodic drug tests thereafter as

23    determined by the court, you must cooperate in the collection

24    of DNA as directed by the probation officer, and must make

25    restitution in accordance with the law.

H7BsPARs

1        In light of the nature of the crime, I am also going

2    to follow the recommendation of the probation department and

3    impose the following special conditions:  That you provide the

4    probation officer with access to requested financial

5    information while you're on supervised release, not incur any

6    new credit card charges or open lines of credit without the

7    approval of the probation officer unless you're in compliance

8    with the installment payment schedule, and that you be

9    supervised in the district of your residence.

10        I decline to impose a fine in light of the restitution

11    and forfeiture obligations I intend to impose.  I am required

12    to impose a mandatory special assessment of $100, and I do so.

13    I understand that you and the government have agreed to

14    restitution in the amount of no less than $20,344,010,

15    representing the net loss to any victims, but that the

16    government intends to submit a proposed restitution order with

17    names of the victims within 90 days, is that correct?

18            MS. MAGDO:  That's correct, your Honor.

19            THE COURT:  What would you propose with respect to the

20    timing of the restitution payments, the payment schedule?  Is

21    that something you intend to submit as well?

22            MS. MAGDO:  Yes.  I can include that in the

23    submission, your Honor.

24            THE COURT:  All right.  Pursuant to the consent order

25    of forfeiture money judgment signed back in January, I am also

H7BsPARs

1    entering a money judgment against you in the amount of

2    $23,186,860, representing the amount of money illicitly taken

3    by you, and the forfeiture of all property which constitutes or

4    is derived from the offense on June 16.  A final order of

5    forfeiture as to specific properties was filed.  I am going to

6    incorporate those two documents into the judgment.

7             With respect to the payment schedule for forfeiture,

8    is there any recommendation from the government?

9             MS. MAGDO:  Your Honor, the specific property has

10   already been forfeited, as your Honor is aware.  If I may

11   include that with the restitution payment proposal?

12            THE COURT:  Is there any objection to that?

13            MS. GATTO:  No.

14            THE COURT:  If necessary, I'll amend the judgment to

15   include that.

16            Before reading your appellate rights, I want to

17   discuss a surrender date.  Of course I am going to have that

18   surrender date, which the government has suggested, as

19   appropriate as well after the baby is born.

20            MS. GATTO:  Judge, I was going to make a proposal.  I

21   don't know if it is possible that we come back three months

22   after the baby is born.  At that point, Ms. Park will see what,

23   if any, nursing needs she has for the baby and also the state

24   of her brain aneurysm, and set the surrender date three months

25   after the birth of her son.  And then the idea would be, we

H7BsPARs

```
1    would prepare to ask for either, whether it be six weeks or

2    three months or something reasonable, but --

3              THE COURT:  Does the government have any objection to

4    that?

5              MS. MAGDO:  No.  Although, I believe Ms. Gatto may

6    have misspoken.  I think she said set the next hearing, not the

7    surrender date for three months.

8              THE COURT:  I think she said actually set the

9    surrender date.

10             MS. GATTO:  Your Honor, that would give me an

11   opportunity, to the extent we can, work with the BOP to figure

12   out how to set up medical needs before.  It is not an easy

13   process, because we don't even know where she is going.  It

14   would give us a little --

15             THE COURT:  I'll do that.  Why don't we set a date

16   now.

17             The baby is due in September, but when exactly?

18             MS. GATTO:  The baby, there is a scheduled C-section

19   on August 29.  I thought the end of November.

20             THE COURT:  Why don't we set a conference for that

21   date.  Why don't we set a conference date for November 29 at

22   9:30.

23             MS. GATTO:  Thank you.

24             THE COURT:  At that time, I do want both the parties

25   to be up on all of the medical issues, and I do expect that
```

H7BsPARs

1   Ms. Park will have child care, to the extent consistent with

2   her husband's work schedule, in place at that time and will set

3   a surrender date at that time.

4           That is the sentence of this court.  Ms. Park, you

5   have a right to appeal your conviction and sentence, except to

6   whatever extent you may have validly waived that right as part

7   of your plea agreement.  If you do choose to appeal, the notice

8   of appeal must be filed within 14 days of the judgment of

9   conviction.  If you're not able to pay for the cost of an

10  appeal, you may apply for leave to appeal *in forma pauperis*,

11  which simply means that court costs and filing fees will be

12  waived.  If you request, the Clerk of Court will prepare and

13  file a notice of appeal on your behalf.

14          Does the government move to dismiss the open counts

15  against Ms. Park?

16          MS. MAGDO:  The government so moves.

17          MS. GATTO:  Your Honor, I'm sorry.

18          THE COURT:  It will be dismissed.

19          MS. GATTO:  One more comment.

20          Can you waive interest on the restitution?  I think it

21  is 20-something million dollars.  The interest shouldn't be the

22  concern.

23          THE COURT:  Any objection?

24          MS. MAGDO:  No.

25          THE COURT:  I'll do that.

H7BsPARs

1              Thank you.  We are adjourned.

2              I want to thank, again, all the victims, both

3    Ms. Olsen, if you can pass that along to the victims who

4    submitted letters and to those who came here today.  It was

5    very important to me to hear perspectives from all sides.  I

6    know that this is an emotional case and has been for everybody

7    involved, but I want to thank you all for writing and speaking

8    and sharing your thoughts and feelings with me.

9              We are adjourned.

10                             o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25