UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES | : | 16 Cr. 473 (RA) |
| - v. - | : | |
| HAENA PARK, | : | |
| *Defendant.* | : | |
| | : | |

----------------------------------------------------------------x

# EMERGENCY MOTION FOR SENTENCE REDUCTION
## PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

                                      Julia Gatto, Esq.
                                      Federal Defenders of New York
                                      52 Duane Street, 10th Floor
                                      New York, New York 10007
                                      Tel.: (212) 417-8750
                                      Counsel for Haena Park


TO:    Geoffrey Berman, Esq.
           United States Attorney
           Southern District of New York
           One St. Andrew's Plaza
           New York, New York 10007
           Attn: AUSA Christina Magdo, Esq.

Haena Park respectfully submits this motion seeking compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). Specifically, Ms. Park requests that the Court promptly resentence her to time served (approximately 16 months), with the remaining custodial portion of her sentence (approximately 15 months, accounting for good time credit) to be served on home confinement. As the Court is surely aware, we are in the midst of an unprecedented health crisis. Ms. Park, who suffers from a constellation of preexisting medical conditions, is among those most vulnerable to suffer serious, if not fatal, complications were she to contract the COVID-19 virus. She is currently imprisoned at FCI Danbury, where nine inmates have tested positive for COVID-19—the second highest number of confirmed cases at any BOP Facility. Ms. Park therefore submits this emergency motion for relief.

## BACKGROUND

**Ms. Park's Conviction and Incarceration**

In 2016, Haena Park was charged with various fraud offenses relating to a Ponzi scheme she perpetuated between 2009 and 2016. On January 13, 2017, she pled guilty to commodities fraud in violation of 7 U.S.C. 6(b)(a)(1) and (2), and 13(a)(1) and (a)(5). *See* Park Final Presentence Investigation Report (PSR) ¶ 5. On July 11, 2017, this Court sentenced Ms. Park to 36 months in prison, to be followed by three years of supervised release.

At the time of her sentencing, Ms. Park was in the midst of a high-risk pregnancy and being treated for, among other ailments, a brain aneurysm. To accommodate her health needs and so that she could give birth and bond with her

1

newborn son, Ms. Park's surrender date was delayed. She began serving her prison sentence on December 1, 2018. According to the Bureau of Prisons website, her projected release date, with credit for good-time, is June 19, 2021.

Ms. Park is serving her sentence at FCI-Danbury.

**The COVID-19 Pandemic**

The United States and the world are currently in the midst of a serious and urgent public health crisis. New York and its surrounding states are the U.S. epicenter of this crisis. On March 11, 2020, the World Health Organization officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[1] This week, the Centers for Disease Control and Prevention (CDC) report that COVID-19 has infected over 180,000 people across the United States, leading to more than 3,600 deaths.[2] Over 3,000 cases have been reported in Connecticut and, this week in a 24-hour period, Connecticut's death toll from the virus doubled.[3]

The CDC and other public health organizations have identified individuals who are particularly susceptible to COVID-19, and who are at the greatest risk for life-threatening consequences should they contract it. These higher risk categories

---

[1] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), *available at* https://bit.ly/2W8dwpS.

[2] *See* CDC, *Cases in U.S.*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[3] Gregory B. Hladky, *"Death toll and confirmed COVID-19 cases rise sharply as Gov. Lamont warns state: 'We're on our own'"*, CT MIRROR (Mr. 31, 2020) at https://ctmirror.org/2020/03/31/coronavirus-outbreak-hits-state-mental-health-facilities-as-mobile-hospitals-go-up-across-connecticut/.

2

include older adults; individuals with HIV or other immune-compromising diseases; those with asthma and lung disease; and those with hypertension.[4]

**Ms. Park's Serious Health Problems**

Ms. Park is 44 years old. She squarely falls within the CDC's high-risk classification: she suffers from immune-compromising diseases, asthma, and lung disease. As described in the PSR and the defense's prior sentencing submission to the Court, Ms. Park has several serious health conditions, including Mast Cell Activation Syndrome ("MCAS"), Ehlers-Danlos Syndrome type III ("hEDS"), and autonomic dysfunction/postural orthostatic tachycardia syndrome ("POTS"). As described more fully in Ms. Park's sentencing submission and its attachments, including medical records and letters from Ms. Park's treating physicians, Ms. Park's conditions are marked by poor immunological functioning and can manifest in life-threatening asthma attacks. *See, e.g.,* Exhibit L to Sent. Sub., Medical Letter from Anne Maitland, MD, PhD.

Dr. Maitland—one of Ms. Park's primary physicians before her incarceration—recently became so concerned regarding her former patient's vulnerabilities to COVID-19 that she emailed Ms. Park's treating BOP doctors to urge for "a furlough" "given the risk of COVID-19 exposure causing severe illness in Ms. Park." Exhibit A

---

[4] *See* CDC, *Are You at Higher Risk for Severe Illness?*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html; Anna Miller, et al., *10 common health conditions that may increase risk of death from the coronavirus, including diabetes and heart disease*, Business Insider (Mar. 23, 2020) (collecting scientific reports of disease), *available at* https://www.businessinsider.com/hypertension-diabetes-conditions-that-make-coronavirus-more-deadly-2020-3.

3

hereto, Mar. 25, 2020 Maitland email. As she explained, the decision to release Ms. Park "could mean life or death." *Id.*

**Current Conditions at Danbury**

"Prisons are petri dishes for contagious respiratory illnesses."[5] Inmates cycle in and out of Bureau of Prisons (BOP) facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing.

Given what we know about COVID-19, the BOP is on the precipice of an uncontrollable and lethal explosion of the virus. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[6] Further, public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[7]

---

[5] *See Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, L.A. Times (Mar. 20, 2020), *available at* https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration; Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.

[6] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), *available at* https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[7] *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States*, (Mar. 2, 2020), *available at* https://bit.ly/2W9V6oS.

The BOP already has reported two inmates succumbing to COVID-19 complications. [8] In the coming weeks, if not days, we can expect this grim number to rise.

Danbury has proven particularly susceptible to the spread of the virus. As of yesterday, Danbury had 9 reported cases amongst its prison population. Only one other federal facility has more cases—FCC Oakdale (11 cases). And, this alarming data is likely underreporting the actual number of inmates suffering with and actively spreading the disease. According to media reports, BOP facilities have "stopped testing prisoners who are symptomatic for the coronavirus due to 'sustained transmission'…."[9] Furthermore, the BOP is only providing numbers for positive test results and not the numbers of inmates presenting with symptoms consistent with COVID-19. At Danbury, dozens of inmates, if not more, are symptomatic.

Danbury, like all BOP facilities, has not—and because of its prison setting, can not—effectively implement social distancing and similar measures required to slow the spread of the virus. Inmates still congregate, sleep, and eat together. There are only a handful of bathroom facilities to be shared by the 100+ women in the low

---

[8] Rich Schapiro, *Inmate Dies After Contracting Coronavirus at Louisiana Federal Prison,* NBCNEWS (Mar. 29, 2020), at https://www.nbcnews.com/news/us-news/inmate-dies-coronavirus-louisiana-federal-prison-n1171571; Rosemary Westwood, *Second Inmate Federal Inmate Dies from COVID-19,* NPR (April 1, 2020), at https://www.npr.org/sections/coronavirus-live-updates/ 2020/04/01/825448006/second-federal-inmate-dies-from-covid-19.

[9] Walter Pavlo, *"Bureau of Prisons Underreporting Outbreaks of COVID-19 in Prison,"* Forbes (April 1, 2020) at https://www.forbes.com/sites/walterpavlo/ 2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#278e3b907ba3.

security prison. The women also share and use a limited number of telephones and computers. Cleaning products and cleaning measures are scant.

As of yesterday, the BOP instituted a 14-day lock-down of all inmates. At a minimum security facility like Danbury, that employs group sleeping arrangements (as opposed to two-men cells), the women will now be confined in their dorms with a crowd of dorm mates.[10] The new restrictions also are expected to reduce opportunities for the inmates to purchase sanitary products from the commissary, including soap which is not provided as a matter of course by the facility.[11]

Separate from the inmates, the staff at Danbury is also vulnerable to the rapid spread of the virus. As a result, staffing, including medical staff, has been cut. Before the pandemic, as treatment for her unique medical issues, the BOP was administering to Ms. Park bi-weekly medical injections. Ms. Park has been told that those injections will be discontinued because Danbury no longer has the staff to provide the care she needs.

**The First Step Act and this Court's Expansive Authority to Reduce a Sentence**

Under a section of the recently-enacted First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court,

---

[10] *Id.*

[11] *Id.*

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment ..., after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission ....

18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement defines "extraordinary and compelling reasons" to include a defendant's medical conditions, age, family circumstances, and "other reasons." *See* U.S.S.G. § 1B1.13, Application Note 1. The Commission also requires that the "defendant is not a danger to the safety of any other person or to the community." *Id.*

Fundamentally, the First Step Act's changes to the compassionate release regime—titled "Increasing the Use and Transparency of Compassionate Release"—were designed to help get more eligible, non-dangerous individuals out of prison. "The First Step [Act] was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 97 Cr. 06 (AJT), 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). "Congress's express purpose in implementing these changes was to expand the use of compassionate release sentence reductions ...." *United States v. Young*, No. 00 Cr. 02 (AAT), 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 4, 2020). The First Step Act sought to expand the use of compassionate release in two primary ways: First, the Act

7

empowers defendants to petition district courts directly, rather than having to wait for the Bureau of Prisons to act. Second and relatedly, it shifts greater discretion to district courts to determine what constitutes "extraordinary and compelling" reasons for a sentence reduction under the statute. Essentially, with the First Step Act, Congress empowered the judiciary to take on the role the BOP once held as the functional adjudicator of compassionate release requests and enabled courts to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the statute.

As a result, by the plain terms of the statute, a district court's authority to reduce a sentence pursuant to this provision is expansive: a district court may reduce a defendant's prison sentence after considering the 18 U.S.C. § 3553(a) factors if it finds "extraordinary and compelling" reasons for a reduction; that the reduction is "consistent with applicable policy statements issued by the Sentencing Commission"; and that the defendant does not present a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A); *see also, e.g.*, *United States v. Wong Chi Fai*, No. 93 Cr. 1340 (RJD), 2019 WL 3428504, at *2 (E.D.N.Y. July 30, 2019). Nothing more is required.

In particular, the weight of authority makes clear that a court's power to reduce a sentence and grant compassionate release is not limited by Bureau of Prisons policies, or even by the specific factors enumerated by the Sentencing Commission in U.S.S.G. § 1B1.13, Application Note 1(A)-(C). Most courts to consider the issue have found that district courts can reduce sentences for reasons "consistent" with Commission guidance, and that courts now stand in place of the Bureau of

8

Prisons for purposes of the Guidelines' "catch-all" provision in U.S.S.G. § 1B1.13 Application Note 1(D). Courts therefore have expansive authority to define for themselves what constitutes "extraordinary and compelling" reasons to reduce a sentence. Based on this authority, district courts have reduced sentences for a variety of reasons—even if the reductions are opposed by the Bureau of Prisons and even if the reasons do not fit neatly into the Sentencing Commission's specifically enumerated reasons. *See, e.g.*, *Redd*, 2020 WL 1248493 at *8, n.18 (collecting cases regarding court's authority and reducing sentence based on severity of defendant's "stacked" § 924(c) sentences); *Young*, 2020 WL 1047815 at *5-6 (granting compassionate release and rejecting government argument that defendant's motion should be denied because he did not meet the medical criteria in U.S.S.G. § 1B1.13, finding that "district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release"); *United States v. Maumau*, No. 08 Cr. 758 (TC), 2020 WL 806121, at *6 (D. Utah Feb. 18, 2020) (granting compassionate release based on severity of sentence and defendant's young age at the time of the offenses); *United States v. Urkevich*, No. 03 Cr. 37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (granting motion and reducing sentence based on original sentence's undue severity); *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (granting release because defendant was the sole available caregiver for his ailing mother, though Commission only listed caregiving for a partner, spouse, or minor child); *United States v. Beck*, No. 13 Cr. 186, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (finding that "[w]hile the [Sentencing Commission's] old policy

9

statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction" and granting release based on BOP's mismanagement of defendant's medical care). A district court's order must be "consistent" with the Sentencing Commission's guidance—but a court is not limited to the specific enumerated examples set forth by the Commission in finding "extraordinary and compelling" reasons for release.

Courts, inside and outside of the Second Circuit, are increasingly using this provision to grant compassionate release and reduce a defendant's sentence based on the unique dangers posed to that defendant by COVID-19. *See, e.g., United States v. Wilson Perez*, No. 17 Cr. 513 (AT), ECF Docket No. 98, (S.D.N.Y. Apr. 1, 2020); United *States v. Eli Dana*, No. 14 Cr. 405 (JMF), ECF Docket No. 108 (S.D.N.Y. Mar. 31, 2020); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC), ECF Docket No. 1325-1326 (E.D.N.Y. Mar. 30, 2020); *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR), ECF Docket No. 834 (E.D. Wa. Mar. 25, 2020); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB), ECF Docket No. 135 (E.D. Pa. Apr. 1, 2020); *United States v. Pedro Muniz*, No. 09 Cr. 199, ECF Docket No. 578 (S.D. Tex. Mar. 30, 2020); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH), ECF Docket No. 97 (D.D.C. Mar. 27, 2020); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020).

**Ms. Park's Application to the Bureau of Prisons**

On March 27, 2020, Ms. Park submitted an internal request to the Bureau of Prisons to be released to serve the remainder of her sentence under home confinement because of her preexisting health conditions and the dangers that she faced as a result of COVID-19. To date, she has not received a response to this application.

## ARGUMENT

This Court should grant Ms. Park a sentence reduction, so that she can be immediately released from prison. The Court should convert her remaining sentence to home confinement by imposing a sentence of time served and 3 years of supervised release with a condition of approximately 15 months of home confinement (to expire on her currently projected release date of June 19, 2021). This Court has the authority to make this reduction; this reduction would be fully consistent with the compassionate release statute and the 18 U.S.C. § 3553(a) sentencing factors; and this reduction is necessary to protect Ms. Park's life and health.

**I. Because of an ongoing emergency, the Court should hear Ms. Park's application to reduce her sentence now.**

As reflected in the statutory language, a defendant can apply directly to the sentencing court for compassionate release, even if the Bureau of Prisons declines to bring a motion on his behalf. Per the statute, Ms. Park may apply directly to this Court 30 days after the BOP warden receives her request or after she has exhausted her administrative remedies, whichever is earlier.

Although 30 days has not yet passed since Ms. Park made her internal request, we submit that this is an emergency situation in which the Court is empowered to immediately hear Ms. Park's application.

Federal courts have previously found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is some emergency. *See United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g.*, *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (citing *Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

More specifically, courts, in bulk, now have recognized that COVID-19 is an emergency situation and have waived the exhaustion requirements to grant immediate compassionate release. *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *United States v. Wilson Perez*, No. 17 Cr. 513 (AT), ECF Docket No. 98, (S.D.N.Y. Apr. 1, 2020) (granting release

based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF), ECF Docket No. 108 (S.D.N.Y. Mar. 31, 2020) (granting compassionate release motion without exhaustion of administrative remedies, where government consented); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC), ECF Docket No. 1325-1326 (E.D.N.Y. Mar. 30, 2020) (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR), ECF Docket No. 834 (E.D. Wa. Mar. 25, 2020) (waiving any further exhaustion attempts as futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Pedro Muniz*, No. 09 Cr. 199, ECF Docket No. 578 (S.D. Tex. Mar. 30, 2020) (granting compassionate release based on health conditions that made inmate susceptible to COVID-19; inmate had pending application, so had exhausted admin process); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH), ECF Docket No. 97 (D.D.C. Mar. 27, 2020) (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP).

This is an emergency situation. Every additional day that Ms. Park spends at Danbury-FCI increases the likelihood that she will contract COVID-19 and fall ill. Any delay in hearing this motion will cause irreparable injury to Ms. Park.

**II.    The Court should grant Ms. Park compassionate release.**

On the merits, this Court should grant Ms. Park's motion to immediately reduce her sentence, so that she can be released from prison.

First, there are extraordinary and compelling reasons to grant this reduction. Because of her unique health issues, Ms. Park faces a severe risk of contracting COVID-19 and suffering life-threatening consequences and complications if she does contract this disease. She is 44 years old and has multiple risk factors that are highly associated with death from this disease, including a preexisting lung condition and a severely compromised immune system. Under the current conditions at Danbury-FCI, she has very little ability to protect herself from contracting the disease and becoming severely ill. Because of the conditions of her confinement, she cannot avoid contact with infected areas or people, and she cannot take basic steps to ward off the disease. She obviously has no ability to self-isolate and no access to protective gear, or even basic hygiene supplies. She also is now being denied necessary medical care in the form of her injections. For her own safety, she needs to be removed from Danbury immediately.

Second, granting this reduction would be completely consistent with the § 3553(a) factors and the other statutory prerequisites for compassionate release. This application is based on a combination of Ms. Park's health and the other unique factors described above—in that regard, it is perfectly consistent with the Sentencing Commission's guidance and easily fits within the "other reasons" contemplated by Application Note 1(D).

14

Further, Haena Park is a nonviolent offender who does not present any danger to the community. Her offense of conviction is her only contact with the criminal justice system. She is college-educated (Harvard) and has a long, documented, and impressive work history.

While incarcerated, she has been a productive and supportive member of the prison population. In addition to other productive pursuits, she has participated in Danbury's unique collaboration with Yale Law School, a class called Inside-Out: Issues in Criminal Justice. The program's moderator, Yale Law Professor James Forman, has submitted the attached letter, Exhibit B, urging Ms. Park's compassionate release. In it, he writes:

> I have taught the same course for five semesters and have taught over 50 incarcerated students and 50 law students in that time period. *Never has a student impressed me as much Haena.* … Haena was a class leader, reflected in the fact that she was one of the 2 students voted by her classmates to speak at our closing ceremony. To my mind, if the compassionate release process should apply to anybody, it should apply to Haena.
> Exhibit B (emphasis in original).

Outside the prison walls, Ms. Park also enjoys strong support. She is in a stable, committed marriage and she is the mother to a young child to whom she gave birth shortly before she surrendered to serve her sentence. The family unit, in spite of Ms. Park's incarceration, remains exceptionally close.

Ms. Park has already served a significant portion of her incarceratory sentence under particularly punitive and difficult conditions. This term of imprisonment, coupled with her continuing home incarceration, should be completely sufficient for purposes of punishment and general deterrence. With respect to specific deterrence

15

and rehabilitation, Ms. Park has repeatedly expressed sincere remorse for her offense and, even before her prison sentence, presented no risk of recidivism. Ms. Park certainly can reside safely in the community. If she is released, she has a stable residence to which to return and has treating doctors at the ready. Considering all of the statutory factors, the Court should grant Ms. Park compassionate release.

## CONCLUSION

For the reasons described above, the Court should immediately grant Ms. Park's motion to reduce her sentence, and resentence her to time served, with three years of supervised release, with a special condition of fifteen (15) months of home confinement during this supervised release term.

To the extent that the Court requests any further information or briefing regarding this motion, counsel respectfully requests that such proceedings be in writing or via videoconference or telephone conference.

Dated:    New York, New York
          April 2, 2020

                                                 Respectfully submitted,

                                                 Federal Defenders of New York

                                               By: /s/ Julia Gatto
                                               Julia Gatto, Esq.
                                               Assistant Federal Defender