USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 4/24/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

HAENA PARK,

                Defendant.

No. 16-cr-473 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

      On April 2, 2020, Defendant Haena Park, who suffers from serious medical issues including asthma and immune-compromising diseases, filed an emergency motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), seeking compassionate release in light of the COVID-19 pandemic.  Dkt. 57.  Ms. Park is currently housed at FCI Danbury – a Bureau of Prisons ("BOP") facility that the Attorney General has singled out as experiencing especially high levels of COVID-19 infection and where, as of today, 32 staff and 15 inmates have tested positive for the virus, including one of whom has passed away.  After the Court urged the BOP to resolve Ms. Park's internal request no later than April 10, *see* Dkt. 60, the Government informed the Court on that date that the "BOP ha[d] approved Park's request to be transferred to home confinement pursuant to 18 U.S.C. § 3624."  Dkt. 62.  With its letter, the Government attached the BOP's official response, signed by FCI Danbury's warden, informing Ms. Park of this decision.  Almost two weeks later, on April 22, Ms. Park's counsel informed the Court that Ms. Park had not yet been released, nor had the BOP set a release date for her.  Dkt. 64.  The Court

ordered the BOP to respond. On April 23, in an affidavit submitted by the Government, FCI Danbury's warden explained that, as a result of agency "revis[ions] [to] the criteria which must be met in order for an inmate to be referred to home confinement," Ms. Park's transfer had been "suspended" on April 20 and then "renewed on April 23." Dkt. 69, Ex. 1 (Decl. of Diane Easter, Warden). The BOP now represents that Ms. Park's "transfer to home confinement is set for April 30." *Id.*

On April 3, the Attorney General instructed the BOP that "[w]e have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions." Office of the Attorney General, *Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download. Yet, more than fourteen days after the BOP "approved [Ms. Park] for transfer to home confinement," Ms. Park remains at FCI Danbury. Dkt. 59, Ex. 1. And yesterday, the BOP represented that it needs seven more days to prepare for her transfer to home confinement. Dkt. 69, Ex. 1.

Given the undisputed severity of Ms. Park's health condition and the acute danger presented to her by continuing to be housed at FCI Danbury, the Court can no longer wait for Ms. Park to be released. As the death rate from COVID-19 continues to grow, especially for those with preexisting health conditions, every day counts. Center for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): People Who Are At Higher Risk* (Apr. 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. Accordingly, the Court restores

2

to the docket Ms. Park's emergency motion for compassionate release and grants it. The BOP is ordered to release Ms. Park **immediately**.

## LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), a court may "reduce the term of imprisonment" where (1) "extraordinary and compelling reasons warrant such a reduction," (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and (3) the reduction is supported by the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Tagliaferri*, No. 13-cr-115 (RA), 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019) ("District courts have broad discretion to grant or deny a motion for a sentence reduction."). Nevertheless, based on the plain language of § 3582, a court may only consider a compassionate release motion brought by an incarcerated defendant either "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). "The earlier of these two dates controls." *United States v. Scparta*, 18-cr-578 (AJN), 2020 WL 1910481, at *4 (S.D.N.Y. Apr. 19, 2020). Earlier today, the Government agreed to waive the time required for Ms. Park to exhaust her administrative remedies.[1]

## DISCUSSION

In light of the fact that the Government has agreed to waive exhaustion, the Court turns to the merits of Ms. Park's motion. COVID-19's unprecedented impact on the

---

[1] The Government initially opposed Ms. Park's motion on exhaustion grounds. *See* Dkt. 59. Following this morning's conference with the Court, however, it agreed to "waive the remaining time, approximately three days, for Ms. Park to exhaust her administration remedies." Dkt. 72.

3

health of millions of people across the world is, tragically, all too apparent.  *See* World Health Organization, Coronavirus (COVID-19) (Apr. 23, 2020), *available at* https://covid19.who.int/.  On March 13, 2020, the President of the United States declared a national emergency due to the spread of the virus.  *See* White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  Today, the country is still reeling with over 800,000 cases and 45,000 deaths reported.  *See* Central for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.* (Apr. 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

During this time, the virus has infiltrated many of the BOP's jails and prisons, affecting both those who are detained, as well as those who work inside these facilities. The nature of prisons – crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products – put those incarcerated inside a facility with an outbreak at heightened risk.  *See United States v. Resnick*, No. 14-cr-810 (CM), 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020) (noting "the limitations in a prison environment . . . on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission"); Center for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf ("Correctional and detention

4

facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting.  The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff and visitors.").  For this reason, some medical professionals have warned that the highly infectious nature of COVID-19 in conjunction with a prison environment could amount to a ticking time bomb.  *See Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, L.A. Times (Mar. 20, 2020), *available at* https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration ("Prisons are petri dishes for contagious respiratory illnesses.").

The relevant Sentencing Commission policy statement, U.S.S.G. § 1B1.13, provides four circumstances that could constitute "extraordinary and compelling reasons warrant[ing] the [sentence] reduction," one of which is "suffering from a serious physical or mental condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A).[2]  That circumstance is clearly met here.

Ms. Park, who is 44-years old, has a documented history of respiratory issues, including asthma, and immune-compromising diseases.[3]  In connection with the

---

[2] The policy statement further provides that to qualify for compassionate release, a defendant cannot pose "a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  Ms. Park does not present such a danger.

[3] More specifically, Park's known ailments include severe asthma; mast cell activation disorder, which "impacts skin, gastrointestinal tract, central nervous, respiratory, cardiovascular, neurologic, endrocrinologic, and musculoskeletal systems" and can cause "chest pains [and] shortness of breath," Dkt. 37; Ehlers-Danlos Syndrome, a connective tissue disorder; and

5

sentencing of Ms. Park in 2017, the pre-sentence report ("PSR") described her physical health as "very poor," Dkt. 37, and the Court noted that she suffered from "severe asthma," in addition to "other health conditions," Dkt. 44 at Tr. 50:8-9.  In her sentencing submission, a doctor explained that "Ms. Park's conditions are marked by poor immunological functioning and can manifest in life-threatening asthma attacks." Dkt. 57.

Ms. Park's medical conditions are precisely those that render a person increasingly likely to suffer a serious and potentially fatal case of COVID-19, if contracted.  According to the Center for Disease Control and Prevention (the "CDC"), people with ailments that cause trouble breathing, particularly asthma, or compromise their immune system are at a significantly higher risk.  *See* Center for Disease Control and Prevention, *Coronavrius Disease 2019 (COVID-19): People with Asthma* (Apr. 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html ("People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19."); Center for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): At Risk for Severe Illness* (Apr. 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (explaining that "people of any age who have serious underlying medical conditions," including those with "[a]sthma (moderate-to-severe)," "[c]hronic lung disease," "[s]erious heart conditions," and conditions that can cause a person to be "immunocompromised").  Ms. Park falls squarely within the CDC's high-risk

---

dysautonomia. *See also* Dkt. 57 (stating that she has "immune-compromising diseases, asthma, and lung disease").  In addition, in 2015, Park was diagnosed with a brain aneurysm, for which she had surgery in March 2017.  At sentencing, the Court noted that, while the initial procedure "appear[ed] to have been successful for now," Ms. Park "need[ed] to continue to be screened and surgery may be necessary in the future." Dkt. 44 at Tr. 50:5-8.

classification of those most likely to contract and suffer serious, if not fatal, complications from the virus.[4]

The Court's concern with Ms. Park's health during this time is greatly exacerbated by her place of incarceration. At FCI Danbury, where Ms. Park is being housed, there is already a documented – and worsening – outbreak of COVID-19. At the time that Ms. Park filed this motion, there were believed to be nine confirmed cases of the virus among inmates at FCI Danbury, in addition to "dozens of inmates, if not more, [who] [we]re symptomatic" but had not been tested. *See* Dkt. 57. As of April 23, there have been 32 positive cases of COVID-19 among staff members and 15 among inmates, one fatal.[5] *See* BOP, *Open COVID-19 Tested Positive Cases* (Apr. 23, 2020), https://www.bop.gov/coronavirus/. The increasing rate of infection at Danbury is representative of the rising number of cases across BOP facilities. On March 20, there were two reported cases in BOP facilities nationwide. *See* Dkt. 71. As of April 22, there are 977 cases. *See id*.

Even the Government has recognized the serious risk that COVID-19 poses to those currently living within FCI Danbury's walls. On April 3, Attorney General Barr issued a directive recognizing that the BOP is "experiencing significant levels of infection at several of our facilities, including . . . FCI Danbury." Office of the Attorney General, *Memorandum for Director of Bureau of Prisons: Increasing Use of Home*

---

[4] Ms. Park also asserts that she was informed that her "bi-weekly medical injections," which assist with controlling her compromised immune system, "will be discontinued because Danbury no longer has the staff to provide the care she needs." Dkt. 57.

[5] At this morning's conference, the Government advised the Court that the particular camp in which Ms. Park is housed at FCI Danbury does not have any confirmed cases of inmates or staff infected with COVID-19. Defense counsel contests this factual assertion.

7

*Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download.  That directive urged the BOP to "give priority to these institutions . . . as you continue to process the remaining inmates who are eligible for home confinement" and "to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions." *Id.*

The Court recognizes that the BOP is working to control the spread of COVID-19 within its facilities.  Yet, as the situation currently stands, the combination of Ms. Park's preexisting medical issues that put her at heightened risk of becoming seriously ill from or succumbing to the virus and the worsening outbreak at FCI Danbury establish an "extraordinary and compelling reason[]" warranting her immediate release.  18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Nkanga*, No. 18-cr-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) ("[T]he best – perhaps the only – way to mitigate the damage and reduce the death toll [of inmates from COVID-19] is to decrease the jail and prison population by releasing as many people as possible.").

Although Ms. Park has presented an "extraordinary and compelling reason[]" for compassionate release, the Court must also consider the factors set forth in § 3553(a). Ms. Park's conduct was egregious.  For over six years, through charm and manipulation, Ms. Park defrauded more than 40 individuals of $23 million.  *See* Dkt. 44 at Tr. 47:6-8. As the Court noted at sentencing, Ms. Park's victims, many of whom were those she loved most in the world, suffered harm that is "immeasurable" in "[t]he loss of livelihood, of savings, of college funds, [and] the precious fruits of hard labor[.]"  *Id.* at Tr. 47:21-23.  Some of Ms. Park's victims also "described the devastating loss not only of financial security, but the loss of dignity and trust in others."  *Id.* at Tr. 48:8-10.  In

light of the severity of Ms. Park's conduct and the number of people harmed by it, the Court then believed that "a very substantial sentence need[ed] to be imposed," *Id.* at Tr. 48:18-19, and sentenced her to a term of 36 months in prison accordingly. If not for the unprecedented pandemic facing the nation, Ms. Park would have been required to serve the entirety of that sentence.

Nonetheless, certain § 3553(a) factors also weigh in favor of granting Ms. Park's motion at this time. Ms. Park's health conditions, and the outbreak at FCI Danbury, now take precedence in light of the pandemic. In addition, Ms. Park's offense was her first, was nonviolent, and she appears to pose little risk of recidivating. She has also taken steps to rehabilitate herself while incarcerated over the past 16 months, including by tutoring other women at the prison for six to eight hours a day. *See* Dkt. 57. In light of the BOP's April 9 decision to transfer Ms. Park to home confinement pursuant to § 3624(c), the Court is not alone in finding that the relevant factors weigh in favor of her release from incarceration at this time. *See* 18 § U.S.C. 3624(c)(2) (authorizing the use of home confinement for "prisoners with lower risk levels and lower needs on home confinement"). That the BOP shared the view that it would be appropriate for Ms. Park to be released on home confinement is revealing.

Although releasing Ms. Park from custody is, in the Court's view, appropriate in light of the health issues at play, the Court would not otherwise have chosen to have Ms. Park serve only half of her sentence. The Court's preferred course of action would have been to grant her temporary release, removing her from FCI Danbury during the pandemic while requiring her to eventually serve the remainder of her sentence once the danger from COVID-19 had subsided. But the mechanism for granting temporary release

9

– 18 U.S.C. § 3622(a) – lies solely in the BOP's hands, leaving the Court without any authority to grant the relief it believes most proper in this instance. *See, e.g.*, *United States v. Roberts*, No. 18-cr-528, 2020 WL 1700032, at *3 (The Court does not wish to give Ms. Roberts a windfall; it wishes to temporarily release her until the threat from COVID-19 passes and she can finish her sentence in safety."); *United States v. Credidio*, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *2 (S.D.N.Y. Apr. 2, 2020) ("The Court is thus 'powerless' to order Ms. Credido 'temporarily released from custody until circumstances improve,' even though such temporary release would be 'the rational and right result.'").

In its discretion, however, the BOP chose not to utilize § 3622(a) to "furlough" Ms. Park, but instead approved her for transfer to home confinement pursuant to § 3624(c). Dkt. 62, Ex. 1. Ms. Park was informed of this decision on April 9, and the Court on April 10. *See* Dkt. 62. It was only on April 22 that the Court was advised that the BOP had not yet set a release date for Ms. Park and did "not anticipate that she will be released tomorrow [April 23]," Dkt. 64, even though she had already been under quarantine for 14 days. That day, the Court directed the Government to submit an affidavit from FCI Danbury's warden "explaining why [the BOP] is refusing to transfer Ms. Park to home confinement," as initially represented. Dkt. 65. On April 23, the BOP indicated that although her transfer to home confinement had been delayed because of changes to the relevant guidelines, now "her transfer to home confinement is set for April 30, 2020." Dkt. 69, Ex. 1.

But the Court will not allow Ms. Park to be endangered for one more day. We are living in novel and dangerous times. Every day – indeed, every minute – may count,

10

particularly for someone like Ms. Park who is at a high-risk from COVID-19 and currently lives in a facility with a documented outbreak and limited means of protection. Furthermore, in light of the ever-changing guidelines that the Department of Justice has issued to the BOP regarding home confinement, furlough, and compassionate release, the Court cannot be assured that Ms. Park will indeed be released on April 30, as is currently being represented.

Because it lacks the authority to grant the temporary release it deems most appropriate, the Court is faced with a singular decision: either to leave Ms. Park at FCI Danbury longer during this pandemic despite her documented health risk or to grant her request for compassionate release. To avoid a sentence that was sufficient but no greater than necessary, *see* 18 U.S.C. § 3553(a), from becoming one immeasurably greater than necessary, Ms. Park must be released.

## CONCLUSION

For the foregoing reasons – the current conditions at FCI Danbury, Ms. Park's significant preexisting medical conditions, and the fact that she still remains at FCI Danbury over two weeks after having been approved for home confinement by the BOP, Ms. Park's motion for compassionate release is granted. Her sentence of incarceration is reduced to time served, and she is to be released from BOP custody **effective immediately**. On consent, Ms. Park shall be placed on supervised release status, with home confinement until June 19, 2021, the date on which she was expected to complete her custodial sentence. *See* 18 U.S.C. § 3582(c)(1)(A) (authorizing the Court to "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without the conditions that does not exceed the unserved portion of the original term of

imprisonment)"); Dkt. 71. Furthermore, until June 19, 2021 and for three years thereafter, Ms. Park shall abide by all the terms and conditions of supervised release that were previously imposed on her and are memorialized in her judgment of conviction, dated July 11, 2017. *See* Dkt. 43.

Finally, a word for Ms. Park's victims who object to her release. The Court shares your view that in light of the gravity of her conduct, Ms. Park deserves to spend every day of the sentence that she received in prison. But as other judges across this country have rightly noted, "we are not currently living under normal circumstances." *United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1673244, at *3 (S.D.N.Y. Apr. 6, 2020). The Court fears that leaving Ms. Park any longer at FCI Danbury may convert a three-year prison sentence into a death sentence. And that the Court cannot allow.

SO ORDERED.

Dated:  April 24, 2020
        New York, New York

                                            Ronnie Abrams
                                            United States District Judge